**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|   |   |   |
|---|---|---|
| | * | |
| **ADRIENNE TUCKER,** *et al.*, | | |
| | * | |
| **Plaintiffs,** | | |
| | * | |
| **v.** | | **Case No.: PWG-14-813** |
| | * | |
| **SPECIALIZED LOAN SERVICING, LLC,** | | |
| *et al.*, | * | |
| | | |
| **Defendants.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiffs Adrienne Tucker and Maurice Holmes claim that they entered into a valid mortgage loan modification agreement, but the loan servicers refused to accept their monthly payments under the modified agreement, applying them instead to an earlier version of the loan. Plaintiffs stopped making payments and, as a result, found themselves facing foreclosure on their home.[1] They filed suit in the Circuit Court for Prince George's County against, *inter alios*, their current loan servicer, Defendant Specialized Loan Servicing, LLC ("SLS"); their previous loan servicer, Defendant Saxon Mortgage Services, Inc. ("Saxon"); and the owner of their current loan, Defendant FV-I, Inc., in trust for Morgan Stanley Capital Holdings LLC ("FVI"). ECF No. 2. FVI and SLS removed to this Court on the basis of diversity of citizenship. ECF No. 1. Following two amendments to the complaint, as well as my ruling on Defendants' motions to dismiss, five counts remain.  As to Defendants SLS and FVI only, Plaintiffs allege breach of contract and violations of the Maryland Consumer Debt Collection Act, Md. Code Ann., Com.

---

[1] The foreclosure action since has been dismissed.  State Ct. Docket for *WBGLMC v. Tucker*, No. CAEF13-22298, Jt. Rec. 428.

Law §§ 14-201 *et seq.* ("MCDCA"), and the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101 *et seq.* ("MCPA").   They also allege that all three remaining Defendants are liable for defamation and injurious falsehood. Feb. 3, 2015 Mem. Op. & Order, ECF Nos. 40 & 41; Second Am. Compl., ECF No. 42.

Now pending is Defendants' Motion for Summary Judgment on liability.  ECF No. 94.[2] Because the undisputed evidence establishes that Plaintiffs refused to make payments to bring their loan current, summary judgment in Defendants SLS and FVI's favor is appropriate on the breach of contract claim.  Given that it also shows that Defendants had the right to foreclose on Plaintiffs' Property, Defendants SLS and FVI also are entitled to judgment as a matter of law on Plaintiffs' MCDCA and MCPA claims.   And, because Plaintiffs cannot show that the information allegedly reported was false for purposes of a defamation or injurious falsehood claim, those claims are preempted by federal law and I will grant summary judgment in favor of all Defendants on those claims.

## BACKGROUND[3]

Adrienne Tucker executed a $601,000.00 promissory note ("Original Note") on November 22, 2005 as part of a loan agreement.  Jt. Stmt. ¶ 2, ECF No. 94-3.  The Original Note set Tucker's initial monthly payments at $3,443.23.  Orig. Note § 3(B), 4(A), Jt. Rec. 336–37.

---

[2] The parties fully briefed the Motion.  ECF Nos. 94-4, 95, 96.  "Defendants believe that summary judgment would also be appropriate on the issue of damages," but, because "that determination will likely require ruling on the propriety of Plaintiffs' expert testimony, Defendants reserve their damages argument for that later briefing," if any counts survive their motion on liability. Defs.' Mot. 1 n.1.  A hearing is not necessary.  *See* Loc. R. 105.6.

[3] For purposes of considering Defendants' Motion for Summary Judgment, the Court considers the facts in the light most favorable to Plaintiffs as the nonmovants, drawing all justifiable inferences in their favor. *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009).

She and her husband, Maurice Holmes, executed a Purchase Money Deed of Trust ("Deed of Trust") the same day.  Jt. Stmt. ¶ 4.  Plaintiffs used the funds they received from the loan to purchase 13901 Edsall Street, Upper Marlboro, Maryland (the "Property") and build a home there. *Id.* ¶¶ 1, 3.  They are the record owners of the Property.  *Id.* ¶ 1.

The Deed of Trust created a lien against the Property to ensure repayment of the Original Note. *Id.* ¶ 5.  It provides:

> Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs the Security Instrument [i.e., Deed of Trust] but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signers consent.

*Id.* ¶ 6 (quoting Deed of Tr. § 13, Jt. Rec. 550).  Because Holmes signed the Deed of Trust but not the Original Note, he qualifies as a "co-signer" under it and, in signing the Deed of Trust, "agree[d] that Lender and any other Borrower [i.e., Tucker] can agree to extend, modify, forbear or make any accommodations with regard to the terms of this [Deed of Trust] or the Notice without the co-signers [sic] consent." *Id.*  The Deed of Trust also provides:

> Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current.  Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. . . . Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current.  If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower.

Deed of Tr. § 1, Jt. Rec. 544.

Plaintiffs and the original lender entered into and recorded a Loan Modification Agreement in 2006 ("2006 Modification Agreement), agreeing to a new monthly mortgage payment of $3,380.63.  Jt. Stmt. ¶¶ 7, 8, 10.  The 2006 Modification Agreement defined Tucker and Holmes as the Borrowers, "amend[ed] and supplement[ed]" the Original Note and Deed of Trust, and provided:

> Nothing in this Agreement shall be understood or construed to be a satisfaction, release or novation in whole or in part of the Note and Security Instrument [i.e., Deed of Trust]. Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and the Borrower(s) and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Agreement.

*Id.* at 1 & ¶ 11 (quoting 2006 Loan Modification Agr., Jt. Rec. 3).  The unpaid principal balance remained $601,000.00.  *Id.* ¶ 1.  Together, the Original Note and Deed of Trust, as modified by the 2006 Modification Agreement, comprise the "Loan Documents."[4]

When, "[a]t some point prior to 2009, Ms. Tucker began having difficulty making the monthly mortgage payments," she applied to GMAC Mortgage ("GMAC"),[5] which serviced the

---

[4] The January 2010 GMAC Modification Agreement defines the "Loan Documents" as "[t]he *Mortgage* and Note together, as they may previously have been amended." Jan. 2010 GMAC Modif. Agr. 1, Jt. Rec. 6 (emphasis added). "Mortgage" and "deed of trust" are not synonymous. *See Padley v. SunTrust Mortg., Inc.*, No. CCB-12-890, 2013 WL 588983, at *3 n.4 (D. Md. Feb. 13, 2013) ("[T]his opinion uses the term mortgage . . . to encompass both mortgages and deeds of trust while recognizing there are important differences between mortgages and deeds of trust that are not relevant to this case."). The parties' briefing makes clear, however, that references to the "Mortgage" actually refer to the Deed of Trust, as amended. *See* Defs.' Mem. 11 ("[T]he loan documents . . . included the *DOT* and the FNMC Modification." (emphasis added)); Pl.'s Opp'n 10 ("The 'Loan Documents' accordingly consisted of the FNMC Promissory Note dated November 22, 2005, the November 22, 2005 *Deed of Trust*, and the May 31, 2006 FNMC Modification Agreement." (emphasis added)); *see also* Jan. 2010 GMAC Modif. Agr. 1, Jt. Rec. 6 ("The Note is secured by a Mortgage, *Deed of Trust*, or Deed to Secure Debt." (emphasis added)).

[5] Plaintiffs originally named GMAC as a Defendant but voluntarily dismissed their claims against GMAC and amended their complaint to omit GMAC as a Defendant. *See* ECF Nos. 18 & 22.

loan at the time, for a loan modification. *Id.* ¶¶ 13, 14. "GMAC offered Ms. Tucker a trial loan modification under the Home Affordable Modification Program," and after she successfully made "trial payments on November 1, 2009, December 1, 2009 and January 1, 2010," it offered her a permanent modification agreement in January 2010 ("January 2010 GMAC Modification Agreement" or "GMAC Agreement"). *Id.* ¶¶ 15–16. She signed it on January 23, 2010, and a "Limited Signing Officer" signed on behalf of GMAC on February 1, 2010. *Id.* ¶¶ 18, 19.

The GMAC Agreement identified Tucker as the Borrower. Jan. 2010 GMAC Modif. Agr. 1, Jt. Rec. 6. In Section 1, Tucker represented that she was "experiencing financial hardship" causing her to be "in default under the Loan Documents" (i.e., the Original Note and the Deed of Trust, as amended by the 2006 Modification Agreement) and unable "to make the monthly mortgage payments"; that she "live[d] in the Property as [her] principal residence"; that the Property's ownership had not changed; that she had "provided documentation for all income that [she] receive[d]"; that she would obtain credit counseling if required by the Lender; and that she would or already had made "all payments under a Trial Period Plan or Loan Workout Plan," and she certified under penalty of perjury that all of the documents and information she had provided were true and correct. Jan. 2010 GMAC Modif. Agr. § 1, Jt. Rec. 6–7. The January 2010 GMAC Modification Agreement provided that, if these "representations . . . continue[d] to be true in all material respects," then the GMAC Agreement would, "as set forth in Section 3, amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage." *Id.* at 1.

It also stated that "TIME IS OF THE ESSENCE," and "[i]f prior to the Modification Effective Date as set forth in Section 3 the Lender determine[d] that [Tucker's] representations in Section 1 [were] no longer true and correct, the Loan Documents [would] not be modified and

th[e] Agreement [would] terminate." *Id.* § 2(A)–(B).   Additionally, "the Loan Documents [would] not be modified unless and until (i) [Tucker] receive[d] from the Lender a copy of this Agreement signed by the Lender, and (ii) the Modification Effective Date (as defined in Section 3) ha[d] occurred." *Id.* § 2(C), Jt. Rec. 7.  The GMAC Agreement also provided that "the Lender [would] not be obligated or bound to make any modification of the Loan Documents if [Tucker] fail[ed] to meet any one of the requirements under th[e] Agreement." *Id.*  Section 3 provided that, if Tucker's Section 1 representations "continue[d] to be true in all material respects and all preconditions to the modification set forth in Section 2 ha[d] been met" (i.e., that the Section 1 representations remained true and Tucker received a copy of the GMAC Agreement signed by the lender), then "the Loan Documents [would] automatically become modified on 02/01/2010 ('The Modification Effective Date') and all unpaid late charges that remain unpaid [would] be waived." *Id.* § 3.

Monthly payments of $2,297.82 (to adjust annually after the first year) under the January 2010 GMAC Modification Agreement were due beginning on February 1, 2010.  *Id.* § 3(C).  The new principal balance was $504,176.89.  *Id.* § 3(B).  As part of the GMAC Agreement, Tucker agreed "[t]hat all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless a borrower or co-borrower is deceased or the Lender has waived this requirement in writing." *Id.* § 4(A).

GMAC received the signed January 2010 GMAC Modification Agreement on January 28, 2010, July 21, 2010 GMAC Ltr. to Div. of Fin. Reg., Jt. Rec. 28; signed it on February 1, 2010, Jt. Stmt. ¶ 18; and then returned it to Turner, Holmes Dep. 178:10–13, Jt. Rec. 219. Viewing these facts in the light most favorable to Plaintiffs, a reasonable jury could find that the January 2010 GMAC Modification Agreement went into effect on February 1, 2010.

When GMAC "attempt[ed] to record the modification," however, "the documents were rejected as the recorded Deed of Trust also listed Maurice D. Holmes."  July 21, 2010 GMAC Ltr. to Div. of Fin. Reg., Jt. Rec. 28.  "Because the loan modification documents are required to be recorded," GMAC sent Plaintiffs a new modification agreement with the same terms on March 18, 2010 and asked them both to sign and return it by March 26, 2010.  *Id.*; Jt. Stmt. ¶¶ 20, 21.  Plaintiffs signed it late, on April 8, 2010; GMAC did not receive it until April 20, 2010; and the modification was denied and the proposal marked "VOID."  Void Modif. Agr., Jt. Rec. 12–15; July 21, 2010 GMAC Ltr. to Div. of Fin. Reg., Jt. Rec. 28.  Then, in April 2010, GMAC sent Tucker yet another modification agreement, identifying only Tucker as the Borrower, but Plaintiffs did not return a signed copy before the May 1, 2010 deadline. Interest Only Step Rate Loan Modif. Agr., Jt. Rec. 18; July 21, 2010 GMAC Ltr. to Div. of Fin. Reg., Jt. Rec. 28; Sept. 27, 2010 GMAC Ltr. to Div. of Fin. Reg., Jt. Rec. 31.

The Financial Transactions history on Tucker's account shows that the principal balance from March 9, 2009 through April 9, 2010 remained $601,000.00.  Jt. Rec. 34–40.  It also shows that GMAC received payments of $2,297.82 on February 5, 2010; $2,298.00 on March 8, 2010; $2,298.00 on April 12, 2010; and $2,295.29 on May 11, 2010.  Jt. Rec. 35–36; *see also* Tucker Dep. 50:14 – 51:10, Jt. Rec. 113 (testifying that Plaintiffs made four payments between February and May 2010); Holmes Dep. 70:22 – 72:15, Jt. Rec. 192 (same).  The majority of the funds appear as "unapplied" funds, which "mean[s] funds that were received from the Plaintiffs that were insufficient to bring the loan current, and which were placed into a suspense account." Ward Aff. ¶ 7, Jt. Rec. 65; *see also* Tucker Dep. 50:3-13, Jt. Rec. 113 (a payment noted as "unapplied" means "they are not accepting payment").

On October 5 and November 13, 2009 and April 9 and June 7, 2010, GMAC applied $3,380.63 (the amount due monthly under the 2006 Modification Agreement) from Plaintiffs' account to the interest.  Jt. Rec. 34, 36.  According to Defendants, "[o]n June 7, 2010, GMAC applied a portion of the 'unapplied' funds to the $3,380.63 payment that had been due on February 1, 2009." Defs.' Mem. 2.  In correspondence with Lucy Cardwell, an Assistant Attorney General in the Consumer Protection Division of the Maryland Office of the Attorney General, SLS explained that "the payments that were made by Ms. Tucker were applied to the account and advanced the contractual due date to March 2009 in accordance to the terms of the original Note because the modification was never finalized." Jan. 2, 2015 email from Rachel Crampton, SLS Legal Dep't, to Cardwell, Jt. Rec. 45.  In other words, SLS believed that GMAC applied the payment to the Original Note and Deed of Trust, but not to the 2006 Modification Agreement or the January 2010 GMAC Modification Agreement, even though the amount applied was that due under the 2006 Modification Agreement.  Although Defendants acknowledge that "[th]e GMAC payment history accurately reflects the payment history for the Subject Loan," Defs.' Mem. 3, they do not discuss the April 9, 2010 payment.  In a June 8, 2010 letter to Tucker, GMAC informed her that her "request for a loan modification . . . ha[d] been denied" because the "[e]xecuted agreement [was] not returned."  June 8, 2010 Ltr. from GMAC to Tucker, Jt. Rec. 24–25.  The letter referred in the singular to Tucker's "request for a loan modification," but it did not specify which request had been denied.  *Id.*  Thus, a reasonable jury could find that the January 2010 GMAC Modification Agreement remained in effect.

The loan was assigned to Defendant Saxon for servicing on May 27, 2010.  Jt. Stmt. ¶ 22.  Holmes spoke with Saxon in July 2010, when Plaintiffs were "prepared to make the July 2010 payment for $2,298," and learned that Saxon was "just trying to accept the payments from the

original note." Holmes Dep. 180–81, Jt. Rec. 219–20. Plaintiffs did not remit any payments to Saxon because the servicer "wanted the full balance due or nothing at all." Holmes Dep. 180, Jt. Rec. 219.

Saxon then assigned the loan to Defendant SLS on January 20, 2012 for servicing. Jt. Stmt. ¶ 23. When the loan was assigned to SLS, Plaintiffs owed a total of $45,946.40 in payments under the January 2010 GMAC Modification Agreement. *Id.* ¶ 24. Holmes contacted SLS, seeking to make payments on the January 2010 GMAC Modification Agreement and not an earlier version of the loan. *See* Holmes Dep. 85–86, Jt. Rec. 196 ("believ[ing]" that he contacted SLS about the GMAC Agreement and testifying that SLS "did not honor the modification"); Ward Aff. ¶ 9, Jt. Rec. 66 ("SLS's business records include a November 12, 2012 telephone conversation between Maurice Holmes and an SLS representative," in which "Mr. Holmes asked whether SLS would 'honor' the prior loan modification he claimed he received from GMAC"); Fax Receipt & Att., Jt. Rec. 357–65 (July 17, 2012 fax from Holmes to SLS attaching January 2010 GMAC Modification Agreement). Specifically, Holmes "offered to tender to SLS the mortgage payment in the monthly amount provided by the GMAC Mortgage [January 2010 GMAC Modification] Agreement," but "the representative responded that SLS could not accept any amount other than that which its records were indicating were due and owing." Holmes Aff. ¶ 5, Jt. Rec. 379.

SLS reviewed the records for the loan and "determined that there was no loan modification in place and that it was not obligated to accept monthly payments in the amount provided by said loan modification" because "Mr. Holmes did not sign the alleged loan modification"; "GMAC voided the loan modifications in 2010"; and "the Plaintiffs either would not or could not make the payments that had come due between 2010 and January 20, 2012."

Ward Aff. ¶ 11, Jt. Rec. 66–67.   Consequently, SLS appointed substitute trustees to initiate foreclosure proceedings against Plaintiffs. SLS's Interrog. Answer No. 8, Jt. Rec. 75.   The substitute trustees filed a foreclosure action in the Circuit Court for Prince George's County with regard to the Property on August 5, 2013. State Ct. Docket for *WBGLMC v. Tucker*, No. CAEF13-22298, Jt. Rec. 425.   While that proceeding was pending, "SLS offered Ms. Tucker and Mr. Holmes a loan modification on November 15, 2013 during mediation. Ms. Tucker and Mr. Holmes rejected the offered loan modification." Jt. Stmt. ¶ 26. Ultimately, the parties entered into another modification agreement on December 19, 2015 ("2015 Modification Agreement"), Jt. Rec. 56, and the foreclosure action was dismissed on February 9, 2016, State Ct. Docket, Jt. Rec. 428.

Meanwhile, Plaintiffs filed suit in Prince George's County Circuit Court, and SLS and FVI removed to this Court. ECF No. 1.   As amended, their complaint alleges breach of the January 2010 GMAC Modification Agreement by SLS and FVI based on SLS's "refusing to honor its terms, to accept payments from Plaintiffs pursuant to the [January 2010] GMAC Modification Agreement, demanding that payments be made as provided in the original Note, and causing foreclosure proceedings to be filed against Plaintiffs alleging that they are in default under the Original Note."   Second Am. Compl. ¶ 118; *see also id.* ¶¶ 121–22 (alleging that FVI "refused to acknowledge or honor the terms of the Modification Agreement, thereby itself breaching the Modification Agreement" and that FVI "is also liable for the acts of SLS").   They also allege that SLS, on behalf of FVI, notified Plaintiffs that they were in default under the Original Note and, through the substitute trustees, initiated foreclosure proceedings, even though "Plaintiffs had previously advised SLS that the Original Note had been modified by the [January 2010 GMAC] Modification Agreement," such that "SLS knew, or reasonably should have

known, that Plaintiffs were not delinquent or in default of the Original Note."   Second Am.

Compl. ¶¶ 57–63.   Based on these alleged actions, Plaintiffs claim that SLS and FVI violated the

MCDCA, which proscribes the enforcement or attempted enforcement of a right with knowledge

that the right does not exist, and the MCPA, which prohibits unfair or deceptive trade practices,

including unfair or deceptive trade practices that violate the MCDCA.  *Id.* ¶¶ 60, 68–73.

Additionally, Plaintiffs claim that Saxon and SLS informed credit reporting agencies that

Plaintiffs were delinquent and/or in default on the Original Note.  Second Am. Compl. ¶¶ 79–80;

93. They assert that this information was false because the January 2010 GMAC Modification

Agreement had "modified and supplanted" the Original Note, and consequently Plaintiffs were

neither delinquent nor in default on the Original Note, which no longer was in effect. *Id.*  They

also claim that Defendants knew it was false because Plaintiffs had notified them of the January

2010 GMAC Modification Agreement.  *Id.* ¶¶ 84–86, 94. These allegations form the basis of

their defamation and injurious falsehood claims.  *Id.* ¶¶ 79–91, 94–106.

## STANDARD OF REVIEW

Summary judgment is proper when the moving party demonstrates, through "particular

parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or

other materials," that "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of*

*Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013).   If the party seeking summary judgment

demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to

the nonmoving party to identify evidence that shows that a genuine dispute exists as to material

facts.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10

(1986).   The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment.  *Id.*

## DISCUSSION

### Breach of Contract

Under Maryland law, a plaintiff alleging breach of contract must establish "that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation."[6] *Orellana v. Cienna Properties, LLC*, No. JKB-11-2515, 2012 WL 203421, at *5 (D. Md. Jan. 23, 2012) (citing *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001)). According to Defendants, even if the January 2010 GMAC Modification Agreement is valid, which they contest, Plaintiffs must "show that they tendered performance to SLS and Saxon, by offering or tendering an amount sufficient to bring the alleged modification current" or "establish[] that they were ready, willing and able to perform their obligations under the loan modification agreement"  before they can demand Defendants' performance under it.  Defs.' Mem. 9–10.  Plaintiffs counter that "[t]here was no express or implied condition precedent that financial assurance of Plaintiffs' ability to repay the GMAC loan modification was required to be shown as a precondition to Plaintiffs' right to sue upon a breach of the modification agreement." Pls.' Opp'n 3.  Alternatively, they argue that, "to the extent that advance assurance of Plaintiffs' ability to repay the GMAC modification was required, that condition was satisfied during the trial modification period before the permanent modification was offered and accepted."  *Id.*

---

[6] It is undisputed that Maryland law applies.  *See* Defs.' Mem. 9–10, 12–14, 17 (applying Maryland law); Pls.' Opp'n 2–15 (applying Maryland law).

"Performance of the contract by parties suing on it is a condition precedent to recovery." *Hubler Rentals, Inc. v. Roadway Exp., Inc.*, 637 F.2d 257, 260 (4th Cir. 1981) (quoting *Hubler Rentals, Inc. v. Roadway Exp., Inc.*, 459 F. Supp. 564, 596 (D. Md. 1978)).  Stated differently, "a party suing on the contract must first prove his own performance, or an excuse for nonperformance, in order to recover for any breach by the opposing party." *Id.*  A party that has not performed "must be ready, willing, and able to perform." *Plana v. Shoresales, LLC*, No. JFM-03-1227, 2003 WL 21805290, at *4 (D. Md. July 14, 2003) (citing *Prescon Corp. v. Savoy Constr. Co.*, 267 A.2d 222, 225 (Md. 1970)).  In *Prescon*, the Maryland Court of Appeals noted that a plaintiff establishes a prima facie breach of contract case by "submit[ting] the contract" and showing it "was ready, willing and able to perform."  267 A.2d at 225. This showing is necessary because "no person shall call upon another to perform his part of the contract until he himself has performed or is ready and willing to perform all that he has stipulated to do as the consideration of the other's promise." *Wischhusen v. Am. Med. Spirits Co.*, 163 A. 685, 687 (Md. 1933); *see also Sherlock v. Lockheed Martin Corp.*, No. AW-01-254, 2004 WL 3681614, at *7 (D. Md. Feb. 26, 2004) (quoting *Wischhusen* where plaintiffs had failed to perform conditions precedent in contract), *aff'd sub nom. Bi-Tech N., Inc. v. Lockheed Martin Corp.*, 129 F. App'x 9 (4th Cir. 2005).

On the record before me, a reasonable jury could find that the January 2010 GMAC Modification Agreement went into effect on February 1, 2010 and Plaintiffs made payments under it in February, March, April, and May 2010, the initial months after it went into effect.  It also could find that Plaintiffs stopped making payments because GMAC would not apply their payments to the January 2010 GMAC Modification Agreement.  *See* Jan. 2, 2015 email from Rachel Crampton, SLS Legal Dep't, to Cardwell, Jt. Rec. 45.  "The hindrance by one contracting

party which impedes or prevents performance by the other constitutes a breach."   *See Yacoubou v. Wells Fargo Bank, N.A.*, 901 F. Supp. 2d 623, 629 (D. Md. 2012) (quoting *Farmer v. Jamieson,* 354 A.2d 225, 230 (Md. Ct. Spec. App. 1976))), *aff'd sub nom. Adam v. Wells Fargo Bank*, 521 F. App'x 177 (4th Cir. 2013).   Thus, a reasonable jury could find that Plaintiffs performed under the January 2010 GMAC Modification Agreement and former defendant GMAC breached the GMAC Agreement by refusing to apply their payments under it.   Further, "[a] tender is excused where the obligee has manifested to the obligor that tender, if made, will not be accepted, or that a tender would be at most merely a futile gesture."   *Id.* (quoting *Cochran v. Griffith Energy Serv., Inc.,* 993 A.2d 153, 166 (Md. Ct. Spec. App. 2010)).   Therefore, it also would be reasonable to find that GMAC's refusal to apply their payments toward the January 2010 GMAC Modification Agreement excused Plaintiffs' nonperformance, because a mortgagor is "not required to continue to tender monthly payments" if the servicer "made clear that tendering further payments would be futile."   *See id.*   Likewise, a reasonable jury could find that Saxon began servicing the loan in May 2010, when Plaintiffs had been making payments, and Plaintiffs approached Saxon about making payments under the January 2010 GMAC Modification Agreement but did not remit any because Saxon "wanted the full balance due [on the 2006 Modification Agreement] or nothing at all."   Holmes Dep. 180, Jt. Rec. 219.

But, the breach of contract claim is against SLS and FVI, not GMAC or Saxon. Therefore, I must consider whether Plaintiffs proved their performance on the GMAC Agreement when SLS took over or established an excuse for their nonperformance at that time, as well as their readiness, willingness, and ability to perform.   *See Hubler Rentals*, 637 F.2d at 260; *Prescon*, 267 A.2d at 225.   Viewing the evidence in the light most favorable to Plaintiffs, by

the time SLS began servicing the loan, Plaintiffs had not made any payments in twenty months. Thus, they had not performed.

Of course, as noted, on the record before me, a reasonable jury could conclude that this failure was due to GMAC's and Saxon's refusal to accept payments, not a breach by Plaintiffs. But, when SLS took over, *it* had not yet refused Plaintiffs' payment, and thus *its* actions did not excuse their nonpayment. *See Yacoubou*, 901 F. Supp. 2d at 629. And, while the servicers' "refusal of [Plaintiffs'] tender . . . would have had the effect of terminating the accrual of additional interest for the period in question," it "would not have had the effect of erasing [the] underlying mortgage debt" that had accrued since their last payment in May 2010. *Yacoubou*, 901 F. Supp. 2d at 630 (citing *Cochran*, 993 A.2d at 168). Notably, the Deed of Trust provides, in a section that the modifications did not alter, that the "Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current." Deed of Tr. § 1, Jt. Rec. 544. Thus, the Deed of Trust did not obligate SLS to accept any payment for less than the amount necessary to bring the loan current, such that its refusal would not excuse Plaintiffs' nonpayment unless Plaintiffs offered to submit sufficient funds to bring the loan current.

Plaintiffs have not identified any evidence that they made such an offer, or were willing (and able) to make such a payment. Holmes testified that he "believe[d]" that he contacted SLS about the GMAC Agreement and that SLS "did not honor the modification," Holmes Dep. 85–86, Jt. Rec. 196, and there is evidence that he brought the January 2010 GMAC Modification Agreement to SLS's attention. Ward Aff. ¶¶ 9, 11, Jt. Rec. 66–67; Fax Receipt & Att., Jt. Rec. 357–65 (July 17, 2012 fax from Holmes to SLS attaching January 2010 GMAC Modification Agreement). There also is evidence that Plaintiffs offered to make the *monthly payments* under

the GMAC Agreement.  Holmes Aff. ¶ 5, Jt. Rec. 379 (Holmes "offered to tender to SLS the mortgage payment *in the monthly amount* provided by the GMAC Mortgage [January 2010 GMAC Modification] Agreement" (emphasis added)); Ward Aff. ¶¶ 9, 11, Jt. Rec. 66–67.  But there is no evidence that Plaintiffs offered to pay the underlying arrearage necessary to bring the loan current.

To the contrary, there is evidence that when an SLS representative asked Holmes in a November 12, 2012 telephone conversation "whether he wanted reinstatement figures to bring the modification payments current if SLS decided to 'honor' the alleged [January 2010] GMAC modification[,] Mr. Holmes advised [the representative] that he was not interested in reinstating."  Ward Aff. ¶ 9.  And, "SLS's records do not indicate that either of the Plaintiffs have ever offered to make the loan modification payments that came due but were not paid prior to the time that SLS serviced the Subject Loan."  *Id.* ¶ 10.  Plaintiffs have not identified any evidence otherwise.  Consequently, there is no reasonable basis for finding that SLS breached the GMAC Agreement when it said it would not accept payments that were "insufficient to bring the Loan current."  *See* Deed of Tr. § 1, Jt. Rec. 544; *see also Yacoubou*, 901 F. Supp. 2d at 630.  Although the servicers' refusals to accept Plaintiffs' proposed monthly payments under the January 2010 GMAC Modification Agreement could excuse Plaintiffs' nonperformance to GMAC or Saxon when the loan still was current, it does not excuse Plaintiffs' failure and unwillingness to offer SLS the amount due for twenty unpaid months.  Therefore, Plaintiffs cannot prevail on their breach of contract claim.  *See Hubler Rentals*, 637 F.2d at 260; *Yacoubou*, 901 F. Supp. 2d at 629; *Prescon*, 267 A.2d at 225.

Moreover, with regard to Holmes, generally "[o]nly a party to a contract can enforce that contract." *Ashe v. Giant of Md., L.L.C.,* No. AW-06-1293, 2007 WL 7020451, at *6 (D. Md. July

17, 2007); *see also Kuei-I Wu v. Mamsi Life & Health Ins. Co.*, No. RDB-07-1170, 2011 WL 3022571, at *6 (D. Md. July 22, 2011).  The contract Plaintiffs seek to enforce is the January 2010 GMAC Modification Agreement.  *See* Second Am. Compl. ¶ 118.  Defendants contend that, regardless of the GMAC Agreement's validity, Holmes cannot prevail on the breach of contract claim because he "is not a party to the alleged agreement."  Defs.' Mem. 22.

Plaintiffs do not address this argument.  Thus, Holmes has abandoned his breach of contract claim. *See Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (concluding that plaintiff "abandoned her harassment claim by failing to address that claim in her opposition to [defendant's] motion for summary judgment, or to offer clarification in response to [defendant's] reply brief").  Further, it is undisputed that Holmes did not sign the January 2010 GMAC Modification Agreement.  *See* Defs.' Mem. 11–12; Pls.' Opp'n 9; *see also* Jt. Stmt. of Facts ¶ 19.  Nor is he listed as the borrower on the GMAC Agreement.  Jan. 2010 GMAC Modif. Agr. 1, Jt. Rec. 6.  Therefore, he has not shown that he can enforce the contract.  *See Ashe*, 2007 WL 7020451, at *6.

Accordingly, on the record before me, summary judgment in SLS and FLI's favor is appropriate on the breach of contract claim.

## **MCDCA and MCPA Claims**

The Maryland Consumer Debt Collection Act "prohibits debt collectors from utilizing threatening or underhanded methods in collecting or attempting to collect a delinquent debt." *Piotrowski v. Wells Fargo Bank, N.A.*, No. DKC-11-3758, 2013 WL 247549, at *9 (D. Md. Jan. 22, 2013) (quoting *Bradshaw v. Hilco Receivables, LLC*, 765 F. Supp. 2d 719, 731-32 (D. Md. 2011) (citing Com. Law § 14–202)); *see Moss v. Ditech Fin., LLC*, No. PWG-15-2065, 2016 WL 4077719, at *5 (D. Md. Aug. 1, 2016) (same). It specifically provides that a debt collector may

not "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist."

Com. Law § 14-202(8).  The Maryland Consumer Protection Act, "which prohibits unfair and

deceptive trade practices, provides for a derivative cause of action in that any violation of § 14-

202 of the MCDCA constitutes an unfair or deceptive trade practice in Maryland."  *Alston v.

Branch Banking & Trust Co.*, No. GJH-15-3100, 2016 WL 4521651, at *11 (D. Md. Aug. 26,

2016) (citing Com. Law § 13-301(14)(iii)).  Plaintiffs claim that SLS and FVI violated both acts

when they sent Plaintiffs a Notice of Intent to Foreclose on May 4, 2012 and initiated foreclosure

proceedings on August 5, 2013 on the basis that "Plaintiffs were in default under the terms of the

Original Note," thereby attempting to enforce their rights under the Original Note, when

Defendants knew that the 2006 Modification Agreement and the January 2010 GMAC

Modification Agreement both modified the terms of the Original Note.  Second Am. Compl.

¶¶ 57–60, 72.

To prevail on their MCDCA and derivative MCPA claims, Plaintiffs "must satisfy two

elements: (1) that Defendant[s] did not possess the right to collect the amount of debt sought; and

(2) that Defendant[s] attempted to collect the debt knowing that [they] lacked the right to do so."

*Awah v. CAPITAL ONE BANK, N.A.*, No. DKC 14-1288, 2016 WL 930975, at *5 (D. Md. Mar.

11, 2016), *appeal dismissed*, No. 16-1361, 2016 WL 4501959 (4th Cir. Aug. 29, 2016).

Defendants insist that Plaintiffs cannot show that they "did not, in fact, owe the sums claimed by

SLS," as they would have to show to prevail on these claims, because "Plaintiffs were in default,

whether the issue is analyzed based on the original promissory note, the [2006] Modification, or

any of the three proposed GMAC modifications."  Defs.' Mem. 19.

Indeed, it is undisputed that Plaintiffs did not make payments on the loan for twenty

months and declined SLS's offer to bring the loan current under the January 2010 GMAC

Modification Agreement, if SLS chose to honor that agreement.  The Original Note, unmodified in this regard, provides that, if Tucker as the Borrower did "not pay the full amount of each monthly payment on the date it is due," she would "be in default."  Orig. Note § 7(B), Jt. Rec. 338.  Thus, Tucker was in default.

Certainly, there is evidence that Defendants billed Tucker for the amounts due monthly under the Original Note, and it is undisputed that the amount due was modified in the 2006 Modification Agreement.  Further, a genuine dispute exists regarding whether the amount due was modified again in the January 2010 GMAC Modification Agreement.  But what Plaintiffs allege is that Defendants sent a Notice of Intent to Foreclose and initiated foreclosure proceedings based on Tucker's default.  Their allegations that Defendants violated the statutes by billing the wrong amount monthly only appear in their Opposition, and an opposition to a dispositive motion is not a vehicle for amending a pleading. *See Whitten v. Apria Healthcare Grp., Inc.*, No. PWG-14-3193, 2015 WL 2227928, at *7 (D. Md. May 11, 2015).  Moreover, Plaintiffs already had two opportunities to amend their complaint in response to deficiencies that Defendants identified.  ECF Nos. 22, 41.  Consequently, the operative allegations for purposes of the pending motion are that Defendants sought to collect the Property as collateral for the loan Tucker purportedly failed to pay.

The Original Note, also unmodified in this regard, provides:

> If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount

Orig. Note § 7(C), Jt. Rec. 338.  It also provides that, "[i]f Borrower fails to pay these sums [by the deadline set in the Notice of Default], Lender may invoke any remedies permitted by th[e] Security Instrument [the Deed of Trust] without further notice or demand on Borrower."  *Id.*

§ 11, Jt. Rec. 339.   The Deed of Trust "irrevocably grants and conveys" the Property to the

Trustee, "in trust, with power of sale" for the purpose of "secur[ing] to Lender … the repayment

of the Loan."   Deed of Tr., Jt. Rec. 542. It provides that, if the Borrower is in default and notified

of the default and given the opportunity to cure but fails to do so, then

> Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale . . . .
>
> If Lender invokes the power of sale, Lender shall mail or cause Trustee to mail a notice of sale to Borrower in the manner prescribed by Applicable Law. . . . Trustee, without demand on Borrower, shall sell the Property at public auction . . . .

*Id.* § 22, Jt. Rec. 552–53.   Thus, the undisputed evidence shows that Defendants had the right to

sell the Property in the event of default.

Notably, even if Defendants acted under the wrong loan, "[t]he MCDCA's private right

of action is predicated on recovery of 'damages proximately caused by' a violation of the

statute."   *Adle-Watts v. Roundpoint Mortgage Servicing Corp.*, No. CCB-16-400, 2016 WL

3743054, at *4 (D. Md. July 13, 2016) (citing Com. Law § 14-203).   Plaintiffs cannot show

proximate cause based on this alleged violation because, given that Tucker *was* in default by

having made no payments in twenty months, the Property would have been subject to foreclosure

proceedings regardless.   Defendants are entitled to judgment as a matter of law on Plaintiffs'

MCDCA and MCPA claims.

### Defamation and Injurious Falsehood Claims

In support of their defamation and injurious falsehood claims, Plaintiffs allege that

Defendants "reported knowingly false information to credit reporting agencies that Plaintiffs

*were delinquent and/or have defaulted* in repayment of the Original Note." Second Am. Compl.

¶ 79 (emphasis added); *see id.* ¶ 93 (same).   Additionally, they claim:

At the time that Saxon and SLS reported that Plaintiffs *were delinquent and/or have defaulted* in repayment of the Original Note, each was aware that the Original Note had been modified and supplanted in 2010 by the Modification Agreement. Therefore, Saxon and SLS were aware, or reasonably should have been aware, that Plaintiffs were not in default at the time(s) that Defendants reported to credit reporting agencies that Plaintiffs *were in default*.

*Id.* ¶ 80 (emphases added); *see id.* ¶ 94 (same).

Defendants contend that the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, preempts Plaintiffs' state law claims for defamation and injurious falsehood because Plaintiffs base those claims "on the reporting of information to credit reporting agencies," and such claims can survive only on a showing of malice, which, according to Defendants, Plaintiffs cannot make.  Defs.' Mem. 23–24.  They also argue that "Plaintiffs' failure to make any payments on their mortgage for several years defeats their argument" because, as a result, they "were delinquent on their mortgage regardless of the amount of payment due." *Id.* at 27. Essentially, as they see it, even if they reported an inaccurate amount because they attempted to collect on the wrong agreement, the information they reported did not qualify as "false" for purposes of an actionable defamation claim because Plaintiffs were in default whichever contract governed.  *See id.*; Defs.' Reply 11.

As for Mr. Holmes, Defendants contend that they "did not make any false statements about Mr. Holmes, thus there can be no defamation or injurious falsehood liability."  Defs.' Mem. 22.  Plaintiffs do not address this argument. Thus, Holmes has abandoned his defamation and injurious falsehood claims. *See Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997). Moreover, it is undisputed that Holmes did not think FVI or "SLS ever reported . . . anything about [him] or [his] credit," as opposed to reporting about his wife or her credit, and that he did not know if either Defendant "made any false statements about [him] that have caused [him] injury or damage." Holmes Dep. 144, Jt. Rec. 210.  And, he testified that Saxon had not

"made any credit reports about [him]" or "made any false statements about [him]" or "do[ne] anything that has lowered [his] reputation." *Id.* at 147–48, Jt. Rec. 211.

"Section 1681h of the Fair Credit Reporting Act ['FCRA'] provides that 'no consumer may bring any action or proceeding in the nature of defamation . . . based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action.'" *Spencer v. Hendersen-Webb, Inc.*, 81 F. Supp. 2d 582, 597 (D. Md. 1999) (quoting 15 U.S.C. § 1681h(e)).   This qualified immunity "does not extend to common law actions based on false information furnished with malice or willful intent to injure the consumer." *Id.* (quoting *Lema v. Citibank (South Dakota), N.A.*, 967 F. Supp. 150, 151 (D. Md. 1997)).   Malice requires proof that "one of the defendants acted with reckless disregard to the truth or falsity of the reported debt." *Spencer*, 81 F. Supp. 2d at 598.   "Reckless disregard requires the plaintiff to show that the defendant either (1) made the statement with a 'high degree of awareness of . . . probable falsity'; or (2) actually entertained serious doubts as to the truth of the statement." *Id.* (quoting *Foretich v. Capital Cities/ABC,* 37 F.3d 1541, 1551 n.8 (4th Cir. 1994)).

"For the purposes of a defamation claim, a statement is only false if it is 'not substantially correct.'" *Spencer*, 81 F. Supp. 2d at 597 (quoting *Batson v. Shiflett,* 602 A.2d 1191, 1212 (Md. 1992)); *see also Piscatelli v. Van Smith*, 35 A.3d 1140, 1147 (Md. 2012); *Hosmane v. Seley-Radtke*, 132 A.3d 348, 354 (Md. Ct. Spec. App.), *cert. granted*, 136 A.3d 816 (Md. 2016).   Thus, "[m]inor inaccuracies do not amount to falsity provided that the substance or gist of the statement is justified." *Id.*   The burden is on Plaintiffs to prove falsity.   *Piscatelli*, 35 A.3d at 1147. The Court "must consider the statements in their entirety" to "determin[e] whether

allegedly false statements are substantially accurate." *Nanji v. Nat'l Geographic Soc'y*, 403 F.

Supp. 2d 425, 431 (D. Md. 2005) (citing *Heath v. Hughes*, 197 A.2d 104 (Md. 1964)).

> In *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 516–17 (1991), the Supreme Court laid out a broad–ranging review of defamation law's recognition of the idea that a communication is not actionable if its "substance, ... gist, ... [or] sting ... be justified." 501 U.S. at 517. The Court went on to give an alternative test, *viz.,* whether the statement "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.*

*Hopkins v. Lapchick*, 981 F. Supp. 901, 904 (D. Md.), *aff'd*, 129 F.3d 116 (4th Cir. 1997)

In *Spencer*, "[t]he undisputed facts show[ed] that Spencer failed to pay five months rent

at $504 per month, for a total of $2,520." 81 F. Supp. 2d at 597. Thus, even if Spencer

"dispute[d] the costs, fees, and disposition of her security deposit, the base amount of her debt

was at least $2,500." *Id.* The allegedly defamatory report stated that Spencer owed $2,858. *Id.*

at 589–90. The Court concluded that it "was substantially correct in that it was only slightly

inaccurate," and on that basis the Court "dismiss[ed] Spencer's claim relating to this report." *Id.*

at 597–98.

Here, Plaintiffs complain that the allegedly defamatory report stated that they "were

delinquent" or "in default" on the Original Note. Second Am. Compl. ¶¶ 79–80, 93–94.

Notably, Plaintiffs contest the very reporting that they were delinquent or in default, and not the

specific amount reported. *See id.* Even if Defendants reported the delinquency or default based

on Tucker's failure to make payments under the Original Note, rather than the agreement in

effect at the time, the undisputed facts show that some version of the loan was in effect, and

Tucker had not made payments for twenty months when Defendants reported that she was

delinquent and/or in default. Thus, as in *Spencer*, the inaccuracy is in the amount of the debt, not

the fact of the debt. *See Spencer*, 81 F. Supp. 2d at 597–98. The "substance" or "gist" of

Defendants' reports, therefore, was "justified," because Tucker indeed was in default. *See*

*Masson*, 501 U.S. at 517; *see also Hopkins*, 981 F. Supp. at 904.   Moreover, because the undisputed facts establish Tucker's default, Plaintiffs cannot prove a different "truth" that "would have a different effect on the mind of the reader" if it had been reported instead; a nearly two-year failure to make any payments whatsoever would have the same effect, regardless of the applicable agreement.   *See Masson*, 501 U.S. at 517; *see also Hopkins*, 981 F. Supp. at 904. Thus, Plaintiffs cannot show that, in reporting that Tucker was delinquent or in default on the Original Note, Defendants reported false information for purposes of a defamation or injurious falsehood claim. *See Masson*, 501 U.S. at 517; *Spencer*, 81 F. Supp. 2d at 597–98; *Hopkins*, 981 F. Supp. at 904.   Therefore, even if Plaintiffs could show that Defendants acted with reckless disregard in reporting a debt based on the wrong agreement, the FCRA nonetheless would preempt their defamation and injurious falsehood claims because the information Defendants reported was substantially correct.   *See Spencer*, 81 F. Supp. 2d at 597–98.   Summary judgment in Defendants' favor is appropriate on these claims.[7]  *See id.*

## CONCLUSION

In sum, the undisputed evidence establishes that Tucker was in default and refused to make payments to bring the loan current, and therefore Defendants had the right to foreclose on Plaintiffs' Property.   Therefore, Plaintiffs cannot show that Defendant SLS or FVI breached the January 2010 GMAC Modified Agreement or violated the MCDCA or MCPA. Consequently, Defendants SLS and FVI are entitled to summary judgment on those claims. And, Plaintiffs cannot show that the information allegedly reported was false for purposes of a defamation or injurious falsehood claim. Summary judgment in favor of all Defendants is appropriate on those state tort claims.

---

[7] Because I find that the FCRA preempts Plaintiffs' state law defamation and injurious falsehood claims, I need not reach Defendants' statute of limitations argument.

A separate order follows.


Dated: <u>November 1, 2016</u>                                              <u>          /S/                    </u>
                                                                          Paul W. Grimm
                                                                          United States District Judge

lyb